IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GARY JOHNSON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-3581 |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice- | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Petitioner Gary Johnson's Petition for Writ of Habeas Corpus, and Respondent Nathaniel Quarterman's Motion for Summary Judgment. Having carefully considered the Petition, the Summary Judgment Motion, the evidence, and the arguments and authorities submitted by counsel, the Court is of the opinion that Respondent's Motion for Summary Judgment should be GRANTED, and Johnson's Petition for Writ of Habeas Corpus should be DENIED.

## I.   Background

Petitioner Gary Johnson, currently in the custody of the Texas Department of Criminal Justice, filed this federal habeas corpus application pursuant to 28 U.S.C. § 2254. Because this is Johnson's first application for federal habeas relief, a brief history of the case is appropriate.[1]

---

[1]     For the sake of convenience, the key facts surrounding the case are adopted largely from the opinion of the Texas Court of Criminal Appeals affirming Johnson's conviction and sentence. *See Johnson v. State*, 853 S.W.2d 527 (Tex.Crim.App. 1992), *cert. denied*, 510 U.S. 852 (1993). Where this opinion diverges from, or expands upon, the Texas Court of Criminal Appeals' recitation of the facts, it will be noted by specific citations to the record.

On the evening of April 30th, 1986, Bill and Shannon Ferguson were in their pasture waiting for a mare to foal. Sometime before 10:00 p.m. they observed a truck pull over near a gate of the adjacent Triple Creek Ranch. They noticed someone get out of the truck, heard a chain rattle on the gate, and observed someone from the truck go through the gate and onto the ranch. The truck's headlights were off, but Mrs. Ferguson noticed an unusual brake light pattern on the truck.  Concerned that there was a burglary in progress, Mrs. Ferguson ran to her house to call the ranch managers, the Hazeltons. Other evidence showed that the original chain had been cut and a new lock had been placed on the gate.

Fifteen minutes later, the Fergusons observed Jim Hazelton's truck appear at the same gate on Highway 30. Unable to enter that gate, Hazelton backed up and entered the ranch from another location. Eventually, the Fergusons heard Hazelton's truck stop. Upon hearing a gunshot, Mrs. Ferguson rushed to her house to phone Mrs. Hazelton and the police.

While Mrs. Ferguson was calling the police, Mr. Ferguson remained in the pasture watching to see if anyone exited the gate. Several minutes after the first gunshot, Mr. Ferguson heard several shots fired in rapid succession. After a brief silence, Mr. Ferguson heard someone plead for his life. The pleas were silenced by two more shots.  When the police arrived, they discovered the bodies of Jim Hazelton and his brother-in-law, Peter Sparagana.

Witnesses described the truck driven by the intruders as having four large tail lights, two on each side, one above the other, and a Koenig type bed.  Allan McCandles, a Deputy Sheriff in Walker County, saw a truck matching this description in Johnson's pasture after the shootings

2

and saw Johnson driving the truck numerous times.  9 Tr. at 1373-84.[2]  Another police officer

testified that two of the tail lights on Johnson's truck were removed in the two weeks after the

murders.  *Id.* at 1447.

At trial the State presented damaging evidence from three of Gary Johnson's brothers-

Tracey, Randy, and Ricky. Tracey Johnson testified that Gary came to Missouri during the fall of

1986, returned Tracey's .44 caliber pistol, and asked him to destroy it because the pistol was used

in a double murder in which Gary and their brother Terry participated.

Ricky Johnson testified that, during that same visit to Missouri, Gary was in possession

of the .44 caliber pistol, he admitted killing one man with the gun, and he said that he and Terry

also killed a second man. A state firearms examiner later identified a bullet fragment retrieved

from Hazelton's body as being fired from the same .44 caliber pistol that Gary returned to Tracey.

Randy Johnson also testified that Gary told him what happened at the Triple Creek

Ranch. Gary told Randy that he and Terry were out at the Triple Creek to steal something when

two men "got the drop on them." While Terry distracted them, Gary shot one of the men. Gary

and Terry caught the other man, brought him back to the barn, made him kneel, and tied his

hands behind his back. While the second man pleaded for mercy, Gary shoved the gun in his

mouth. The medical examiner testified that the second man died from a contact bullet wound to

the mouth.  Gary explained the reason for killing the two men to his brother Randy: "Dead men

don't talk." *Johnson v. State*, 853 S.W.2d 527, 529-30 (Tex.Crim.App. 1992), *cert. denied*, 510

U.S. 852 (1993).

The defense presented testimony from two inmates in the Walker County Jail that Terry

Johnson told them that he (Terry) killed the two victims.  10 Tr. at 1632-38.  The jury found

---

[2]      "Tr." refers to the transcript of Johnson's trial.

Gary Johnson guilty of capital murder.  *Id.* at 1702.

During the penalty phase, the State presented evidence that Johnson shot a neighbor's dog to death from a distance of 75 to 100 yards, while the dog was standing just a few feet from the neighbor.  11 Tr. at 1710-11.  The State also presented evidence that Johnson was carrying a loaded handgun when he was arrested for the Hazelton and Sparagana murders.  *Id.* at 1720-21.

Dr. James P. Grigson, a psychiatrist, testified for the State.  Based on a hypothetical question that summarized relevant testimony about Johnson, Grigson concluded that Johnson posed a continuing threat to society.  *Id.* at 1726-30.

Johnson's uncle testified that he never saw Johnson act violent.  *Id.* at 1744-46. Johnson's former boss and a coworker testified that Johnson was hard working, respectful and nonviolent. *Id.* at 1747-53.  Johnson's ex-wife testified that Johnson was never violent toward their children, and never drank or used drugs.  *Id.* at 1757-62.  Johnson also called Dr. James Marquart, a sociologist.  Dr. Marquart studied the post-conviction criminality of convicted murderers who's sentences were subsequently reduced or commuted.  He testified that he studied 69 such cases, and none of the convicted murderers ever killed again.  Noting that the American Psychiatric Association states that it is impossible to make a future dangerousness assessment with 100 percent certainty, Dr. Marquart testified that his study of cases in which a prosecution expert predicted future dangerousness showed that the expert was wrong two-thirds of the time. *Id.* at 1764-83.  Dr. Wendell Lee Dickerson, a psychologist, testified that the American Psychiatric Association holds that psychiatrists who, like Dr. Grigson, purport to predict future dangerousness with a high degree of certainty "are engaging in practice little short of quackery." *Id.* at 1799-1808.

The jury unanimously found that Johnson acted deliberately and with a reasonable

expectation that death would result, and that it was probable that Johnson would commit future acts of criminal violence that constitute a continuing threat to society.   *Id.* at 1840. Accordingly, the trial court sentenced Johnson to death.  *Id.* at 1842.

The Texas Court of Criminal Appeals affirmed Johnson's conviction and sentence. *Johnson v. State*, 853 S.W.2d 527 (Tex.Crim.App. 1992).  It denied Johnson's application for a writ of habeas corpus on October 20, 2004.  *Ex Parte Johnson*, No. 55,377-01 (Tex.Crim.App. Oct. 20, 2004).  Johnson filed this federal petition on October 19, 2005, and Quarterman moved for summary judgment on September 19, 2006.

## II.   Discussion

### A.   The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996.  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534

U.S. 885 (2001).  Under the "contrary to" clause, this Court may afford habeas relief only if

"'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a

question of law or if the state court decides a case differently than . . . [the Supreme Court] has

on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th

Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406

(2000)).

      The "unreasonable application" standard permits federal habeas relief only if a state court

decision "identifies the correct governing legal rule from [the Supreme Court] cases but

unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court

either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

where it should not apply or unreasonably refuses to extend that principle to a new context where

it should apply." *Williams*, 529 U.S. at 406.  "In applying this standard, we must decide (1) what

was the decision of the state courts with regard to the questions before us and (2) whether there

is any established federal law, as explicated by the Supreme Court, with which the state court

decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999).  A federal court's

"focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate

legal conclusion that the state court reached and not on whether the state court considered and

discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*,

286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104

(2003). The solitary inquiry for a federal court under the 'unreasonable application' prong

becomes "whether the state court's determination is 'at least minimally consistent with the facts

and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.

1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot

reverse a decision merely because we would reach a different outcome, we must reverse when

we conclude that the state court decision applies the correct legal rule to a given set of facts in a

manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's

adjudication of the merits was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*,

210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual

determinations are presumed correct unless rebutted by "clear and convincing evidence."  28

U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert.*

*denied*, 522 U.S. 1119 (1998).

B.      The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to

summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v.*

*Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).  Insofar as they are

consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure

apply to habeas cases.  *See* Rule 11 of the Rules Governing Section 2254 Cases.  In ordinary

civil cases, a district court considering a motion for summary judgment is required to construe

the facts in the case in the light most favorable to the non-moving party.  *See Anderson v. Liberty*

*Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all

justifiable inferences are to be drawn in his favor"). However, where a state prisoner's factual

allegations have been adversely resolved by express or implicit findings of the state courts, and

the prisoner fails to demonstrate by clear and convincing evidence that the presumption of

correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the

facts of a case to be resolved in the petitioner's favor.  *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Foster v. Johnson*, 293 F.3d 766, 777 (5th Cir.), *cert. denied sub nom Foster v. Epps*, 537 U.S. 1054 (2002); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998).  Consequently, where facts have been determined by the Texas state courts, this Court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

C.      Summary Judgment in the Instant Case

Johnson asserts that the State suppressed material exculpatory evidence, he received ineffective assistance of counsel at the guilt-innocence and penalty phases of his trial, and he was denied due process when the trial court refused his request for instructions on mitigating evidence.  These claims are addressed in turn.

1.      Suppression Of Evidence

In his first claim for relief, Johnson contends that the State violated his constitutional rights by failing to disclose that Bill and Shannon Ferguson were hypnotized by the police.  This fact was discovered by Johnson's state habeas counsel.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 124 S. Ct. 1256, 1272 (2004) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  In *Strickler v. Greene*, the Supreme Court framed the three components or essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued." *Banks*, 124 S. Ct. at 1272 (quoting *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)).

In Johnson's state habeas proceeding, the trial court found that the evidence that the Fergusons underwent hypnosis was suppressed and that it was relevant and material.  It deferred to the Court of Criminal Appeals the question of whether any error was harmless – a question that, as discussed below, in legally inapplicable to a *Brady* claim.  The Court of Criminal Appeals adopted the trial judge's findings and conclusions but dismissed Johnson's petition.  *See Ex Parte Gary Johnson*, No. 55.377-01 (Tex.Crim.App. Oct. 20, 2004) (*per curiam*).  Johnson now argues that, under AEDPA, this Court owes deference to the trial court's findings that this evidence was material and that it was suppressed, and that he is therefore entitled to relief. There are two flaws in Johnson's argument.

First, it is not at all clear that the state habeas court was even addressing the *Brady* issue. The state court did not cite *Brady* or any other federal case or constitutional provision.  Instead, the court analyzed this claim under *Zani v. State*, 758 S.W.2d 233(Tex.Crim.App. 1988).  *See* Pet. Exh. 5 at 10-12.  *Zani* addresses the admissibility of hypnotically enhanced testimony as a matter of Texas evidence law; it is not a *Brady* case.  The conclusion that the state habeas court analyzed this claim only as a question of state evidence law and not as a federal constitutional issue is supported by the habeas court's deferral to the Court of Criminal Appeals on the harmlessness of any error.  As Johnson notes, and Quarterman concedes, once a court finds *Brady* error, such error is not subject to harmless error analysis.  *See Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995).  This is so because the suppression of material evidence, as defined in *Brady* and its progeny, is *per se* harmful.  Therefore, the seemingly muddled reasoning of the state habeas court – finding the suppressed evidence "material" yet amenable to harmless error

9

analysis – becomes much less muddled if the findings are read as doing only what they purport to do, *i.e.*, analyzing the claim under the cited case, *Zani*, but not under *Brady*.  It is only under this interpretation that either the state trial court's findings or the Court of Criminal Appeals' final disposition of Johnson's petition makes sense.  If there was no finding of *Brady* materiality, then there is no finding relevant to Johnson's federal habeas claim to which this Court must defer.

Second, if the state habeas court *did* find *Brady* materiality, that finding was an unreasonable application of Supreme Court precedent and is not entitled to any deference.  As of 2003, when the state trial court issued it findings, Supreme Court precedent clearly established that evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Granting the broadest possible assumption – that disclosure of this evidence would have completely destroyed the credibility of the Fergusons' testimony – there is still no reasonable probability that the result of Johnson's trial would have been different.

For the most part, the Fergusons' testimony merely provided context for the murders.  Had the Fergusons never testified, or been completely discredited, the jury would still have heard testimony that two dead bodies were found on the ranch and that both men died from gunshot wounds.  The jury would still have heard from Johnson's brothers that Johnson returned a .44 caliber handgun to his brother and admitted participating in a double murder.  The only significant detail the jury might not have heard was the observation of the unusual tail light pattern on the truck.  While this detail, and Johnson's possession of a truck with similar tail lights, strengthened the State's case, it was not a dispositive fact in light of Johnson's admissions

to his brothers and his possession of the murder weapon.

In summary, it appears that the state habeas court did not make any findings on the question of *Brady* materiality.  If the state habeas court did make such findings, they were an unreasonable application of clearly established Supreme Court precedent, and the suppressed evidence was not material under *Brady*.  Therefore, Johnson is not entitled to relief on this claim.

### 2.   Ineffective Assistance of Counsel

In his second and third claims for relief, Johnson argues that he received ineffective assistance of counsel during both the guilt-innocence and penalty phases of his trial.  To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 687-88.  Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances.  *Id.* at 688.  Review of counsel's performance is deferential.  *Id.* at 689.

### a.   Guilt-Innocence

Johnson argues that his trial counsel rendered ineffective assistance during the guilt-innocence phase of trial by calling Johnson's brother Terry as a witness.  Terry testified that Gary Johnson killed both victims.  Gary argues that defense counsel knew Terry would so testify based on a statement Terry gave to the police before the trial.  Gary concedes that the testimony of Randy and Ricky Johnson "could together be taken as establishing that [Gary] admitted both

killings," Pet. at 14-15, but argues that their testimony did not clearly establish that he was guilty of both murders.

In Johnson's state habeas proceeding, the trial court found that counsel called Terry to impeach his credibility and show him to be the killer of at least one of the victims by establishing that Terry testified against Gary as part of a plea agreement that spared Terry from the death penalty.  Counsel also called Terry to lay the predicate for an accomplice instruction to the jury. Accordingly, the state habeas court found that counsel's decision to call Terry was a strategic decision.  The court also found that Gary's guilt was also established through Randy Johnson's testimony that Gary admitted shooting one victim and putting a gun in the mouth of the other, and the testimony of the medical examiner that the second victim died from a gunshot wound inflicted by a gun near the victim's mouth.

Johnson now argues that the this other testimony merely created an inference, but did not clearly establish, that he shot both victims.  Assuming that Johnson's characterization is correct, it does not alter the strategic nature of counsel's choice to call Terry.

As Johnson acknowledges, the testimony by his brothers Randy and Ricky and by the medical examiner, at a minimum, created a strong inference that Gary shot both victims: It established that Gary admitted shooting one victim and admitted placing his gun in the mouth of the second victim, and that the second victim was shot in or near the mouth.  Counsel was left with the options of trying to discredit the testimony about Gary's admissions, or arguing that, while Gary put the gun in the victim's mouth, someone else pulled the trigger.  He chose to offer the jury an alternative theory – that Terry Johnson shot the victim and sold out his brother to avoid a death sentence.  To accomplish this goal, counsel called Terry as a witness to try to discredit him.  This was a strategic choice.  "[S]trategic choices made after thorough

12

investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."

*Strickland*, 466 U.S. at 690.  That the strategy was unsuccessful does not change the fact that it

was a legitimate strategic choice by counsel.

> A fair assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and
> to evaluate the conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the evaluation, a
> court must indulge a strong presumption that counsel's conduct
> falls within the wide range of reasonable professional assistance;
> that is, the defendant must overcome the presumption that, under
> the circumstances, the challenged action "might be considered
> sound trial strategy.

*Id.* at 689.  It is clear that counsel made a valid strategic decision to cast doubt on Johnson's

guilt.  That hindsight reveals that the strategy was unsuccessful or flawed does not change this

decision into deficient performance.

Johnson submits affidavits by experienced criminal defense attorneys arguing that

counsel's choice was not reasonable trial strategy.  Rule 702 of the Federal Rules of Evidence

allows a party to offer expert testimony if the testimony "will assist the trier of fact to understand

the evidence or to determine a fact in issue . . . ."  In this case, the Court sits as the trier of fact,[3]

and the expert testimony does not assist the Court.

This Court is intimately acquainted with the legal standards governing ineffective

assistance of counsel claims.  Expert testimony purporting to tell the Court how those legal

standards apply to the facts of a particular case invade the Court's province as trier of the law,

and are not helpful to the Court in determining the facts of the case.  Because the proposed

---

[3]      To the extent that there are relevant factual findings by the state court, this Court
must defer to those findings under the AEDPA standards.  This Court sits as trier of fact where there
are no binding state court factual findings.

expert testimony both moves beyond the appropriate boundaries of expert testimony and is unhelpful to the Court in its role as trier of fact, the affidavits will not be considered.

        b.    <u>Penalty Phase</u>

Johnson claims that his counsel rendered deficient performance during the penalty phase by failing to request an "anti-parties" charge. An "anti-parties" charge is a prophylactic instruction to the jury, in cases in which the jury was instructed on the law of parties, to limit its consideration of penalty phase evidence to conduct shown to have been committed by the defendant. *See Belyeu v. State*, 791 S.W.2d 66, 72 (Tex.Crim.App. 1989), *cert. denied*, 499 U.S. 931 (1991).

Assuming that counsel was deficient for failing to request an anti-parties charge, Johnson still suffered no prejudice. As the Fifth Circuit noted in *Belyeu v. Scott*, 67 F.3d 535, 542-44 (5th Cir. 1995), *cert. denied*, 517 U.S. 1144 (1996), Texas' sentencing phase special issues themselves serve to direct the jury to consider only the defendant's personal culpability. In this case, the trial court submitted the following special issue to the jury:

> Was the conduct of the Defendant, Gary Johnson, that caused the death of the deceased, James Hazelton and Peter Sparagana, committed deliberately and with the reasonable expectation that the death of the deceased or another would result.

SH. at 210.[4] This special issue clearly focuses on Johnson's own conduct and intent; it does not allow for an affirmative answer based merely on his presence at the crime scene or minor participation in the crime. Therefore, even if counsel requested and received an anti-parties instruction, such instruction would only have reiterated what was already clear from the language of the special issue itself. Moreover, in light of the very strong evidence that Johnson

---

[4]    "SH." refers to the transcript of Johnson's state habeas proceeding.

personally shot both victims, there is very little chance that any juror reached a verdict at either phase of trial based on the belief that Johnson was liable only under the law of parties.  Because Johnson fails to demonstrate any prejudice from counsel's failure to request an anti-parties charge, he is not entitled to relief on this claim.

3.    Due Process

During the penalty phase, Johnson asked the trial court to give the following two instructions to the jury:

> You are instructed that prior to answering any special issues, you are to consider evidence in mitigation of punishment, if any, other than the evidence introduced at the guilt/innocence phase of the trial, such evidence, if any, should be considered by you in determining whether or not the conduct of the defendant was deliberate and whether or not there is a possibility the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

> You are instructed that you should answer "no" to any of the foregoing special issues if at least ten or more jurors find and believe, based upon the evidence presented to you in this case, that the defendant's character or record or any of the circumstances of the offense mitigate against the imposition of the death penalty in this case.

In his fourth and final claim for relief, Johnson argues that the trial court's refusal to give these two instructions denied him due process under the Supreme Court's subsequent decisions in *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*) and its progeny.

In *Lockett v. Ohio*, 438 U.S. 586, 608 (1978), a plurality of the Supreme Court held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis for a sentence less than death."  438 U.S. at 604 (emphasis in original).  This holding is based on the plurality's conclusion that death "is so profoundly different from all other penalties" as to

render "an individualized decision . . . essential in capital cases." *Id.* at 605.  In *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*), the Supreme Court clarified that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence."  *Id.* at 797 (internal quotation marks, citation and brackets omitted); *see also Eddings v. Oklahoma*, 455 U.S. 104 (1982).  Johnson argues that the trial court's refusal to give his requested instructions, coupled with the absence of any instruction on mitigating evidence, prevented the jury from considering and giving effect to his mitigating evidence that he is non-violent and has been a hard worker.

In *Penry I*, the Supreme Court found that the same sentencing scheme challenged by Johnson was unconstitutional as applied to Penry because mitigating evidence of Penry's low IQ was effectively beyond the reach of the jury.  While that evidence may have had some mitigating effect in itself, the only effect the evidence could have under the special issues presented to Penry's jury was to increase the likelihood that Penry posed a future danger to commit criminal acts of violence.  Therefore, the jury could only this ostensibly mitigating evidence as supporting a death sentence.  *Penry*, 492 U.S. at 322-26.

Johnson's mitigating evidence is more closely analogous to that at issue in *Graham v. Collins*, 506 U.S. 461 (1993) than it is to *Penry*.  Graham presented evidence of his youth (he was 17 years old at the time of the murder) and of his good character.  *Graham*, 506 U.S. at 464.  The Court found that the jury could give full consideration and effect to this evidence in answering the future dangerousness special issue, *e.g.*, that Graham's youth made him less likely to pose a future danger of criminal violence.  Therefore, the lack of an instruction on mitigating evidence in Graham's case did not deny him due process.  *Id.* at 475-77.

Johnson's mitigating evidence, like Graham's, was directly relevant to the future

dangerousness special issue.  By presenting evidence that he was not violent and that he could hold a job, Johnson countered the State's evidence that he posed a future danger.  The jury had every opportunity to consider this evidence in reaching its verdict.  Because the jury was able to consider and give full effect to Johnson's mitigating evidence, the trial court's refusal to give Johnson's requested mitigation instructions did not deny Johnson due process under *Penry*.

### III.   Certificate of Appealability

Johnson has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  *See Alexander v. Johnson*, 211 F.3d 895, 898(5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting  appellate review to those issues alone."  *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further."

*Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme

Court has stated that

> Where a district court has rejected the constitutional claims on the
> merits, the showing required to satisfy § 2253(c) is straightforward:
> The petitioner must demonstrate that reasonable jurists would find
> the district court's assessment of the constitutional claims debatable
> or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "The nature of the penalty in a capital case is a 'proper

consideration in determining whether to issue a [COA], but the severity of the penalty does not in

itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945,

949 (5th Cir. 1996) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)), *cert. denied*, 520 U.S.

1122 (1997). However, "the determination of whether a COA should issue must be made by viewing

the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)."

*Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered each of Johnson's claims. While the issues Johnson

raises are clearly important, the Court finds that each of the claims is foreclosed by clear, binding

precedent. Therefore, Johnson has failed to make a "substantial showing of the denial of a

constitutional right." 28 U.S.C. § 2253(c)(2). This Court concludes that Johnson is not entitled to a

certificate of appealability.

IV.   Order

For the foregoing reasons, it is ORDERED as follows:

1.     Respondent Nathaniel Quarterman's Motion for Summary Judgment (Docket Entry
       24) is GRANTED;

2.     Petitioner Gary Johnson's Petition for Writ of Habeas Corpus (Docket Entry 1) is in

all respects DENIED, and Johnson's Petition is DISMISSED; and

3.      No Certificate of Appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Order.

**SIGNED** this 28th day of September, 2007.


_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

19